\NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ADAM WAY, | |
| Plaintiff, | Civ. No. 20-13646 |
| v. | **OPINION** |
| ARETE AUTOMOBILI CORPORATION and VITALY FARGESEN, | |
| Defendants. | |

THOMPSON, U.S.D.J.

**INTRODUCTION**

This matter comes before the Court upon the Motion for Default Judgment filed by Plaintiff Adam Way ("Plaintiff") on January 8, 2021 (ECF No. 5), vacated on January 26, 2021 (ECF No. 8), and reinstated on September 8, 2021 (ECF No. 25.) Defendants Arete Automobili Corporation ("Arete") and Vitaly Fargesen ("Fargesen") have not opposed. The Court has decided the Motion based on the written submissions of Plaintiff and without oral argument, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, Plaintiff's Motion for Default Judgment (ECF No. 5) is granted in part and denied in part.

**BACKGROUND**

**I.    Factual Background**

This is a fraud, civil theft, conversion, contract, and quasi-contract action brought by Plaintiff against Defendants Arete and Fargesen (collectively, "Defendants"). (Compl. ¶¶ 73–114, ECF No. 1.)

1

A.     *The Parties*

Plaintiff is an individual who resides in Colorado. (*Id.* ¶ 4.) Arete is a New Jersey corporation with its principal place of business in Monmouth County, New Jersey. (*Id.* ¶ 5.) Fargesen is the sole principal, operator, and registered agent of Arete, and resides in Monmouth County, New Jersey. (*Id.* ¶ 6)

Defendants' business involves "acquiring used vehicles in Eastern Europe," and "refurbishing," "constructing," and "reselling" the vehicles to customers in the United States. (*Id.* ¶ 9.) Defendants do not take title to the vehicles; they "arrange for other individuals or entities to assume title," and "the title holders receive a small percentage of the sales price." (*Id.* ¶ 10.) Defendants have a "business relationship" with nonparty Allvette, LLC ("Allvette"), where Allvette takes title to the vehicles acquired by Defendants and arranges for the sale of the vehicles through "auction houses." (*Id.* ¶ 14.) Nonparty Second Daily, LLC ("SD") is an online auction house that "engages in the business of auctioning 'cool, classic, collectible, enthusiast, [and] niche' motor vehicles." (*Id.* ¶¶ 1, 12, 14.)

B.     *Plaintiff's Purchase of the Land Rover Defender*

At some point before January 11, 2018, Defendants acquired a Land Rover Defender (the "LRD"). (*See id.* ¶ 17.) Defendants "and/or" Allvette arranged to auction the LRD on SD's auction platform. (*Id.* ¶ 16.) Around January 11, 2018, Plaintiff "purchased the LRD at auction through SD." (*Id.* ¶ 17.) Plaintiff also selected certain customizations for the LRD. (*Id.* ¶ 18.) Defendants were to build and customize the LRD per Plaintiff's design specifications and deliver the completed LRD to Plaintiff. (*Id.* ¶ 20.) Defendants "assured" Plaintiff that the LRD would be "completed and delivered within, at most, ten (10) to fourteen (14) weeks." (*Id.* ¶ 21.)

After Plaintiff "work[ed] through the custom design specifications with Defendants, Plaintiff reached a written agreement with SD to purchase the LRD for $92,458.75." (*Id.* ¶ 23.) Under the agreement, Plaintiff would pay 50% of the purchase price to SD up front. (*Id.* ¶ 24.) SD would transfer that money to Allvette, as "the seller of the LRD," which would then transfer "the majority" of that money to Defendants, "as the custom builders of the LRD." (*Id.*) Plaintiff would pay the remaining 50% of the purchase price after Defendants completed the LRD. (*Id.*)

In early February 2018, Plaintiff wired $75,000 to SD. (*Id.* ¶ 25.) SD wired $44,750 to Allvette; and Allvette wired $42,500 to Defendants. (*Id.* ¶¶ 26–27.) After this transaction, SD held $30,250, Allvette held $2,250, and Defendants held $42,500. (*Id.*)

Around March 29, 2018, SD introduced Plaintiff to a "representative of Allvette," Juliano DeCerchio ("DeCerchio"), and directed Plaintiff to correspond with DeCerchio about the completion and delivery of the custom LRD. (*Id.* ¶ 28.) Over the "next several months," Plaintiff "repeatedly requested updates from DeCerchio," who "repeatedly responded" with "excuses for the delays and promises of new future dates of completion and delivery." (*Id.* ¶¶ 29–30.)

Around June 16, 2018, nearly two months after the date that Defendants stated they would deliver the LRD, DeCerchio told Plaintiff that, "owing to the delays," Plaintiff should have SD "wire back" the $30,250. (*Id.* ¶ 31.) He further stated that "they can 'worry about the remaining balance' after the 'buildout is finished and titled.'" (*Id.* ¶ 32.) In "early July 2018," Plaintiff requested SD to return the $30,250, and SD complied. (*Id.* ¶¶ 33–34.)

By August 2018, approximately four months after the agreed-upon delivery date, Plaintiff still had not received the LRD or any "meaningful update on [its] status." (*Id.* ¶ 35.) Given the "repeated delays and excuses," Plaintiff decided to "cancel his purchase of the LRD" and "recoup" his remaining money — $2,250 from Allvette and $42,500 from Defendants. (*Id.* ¶ 36.)

3

Plaintiff also decided to pursue a "substantially identical" LRD from another source. (*Id.*) When he told Defendants and Allvette that "he planned to buy such a car elsewhere" and requested the return of his money, Defendants and Allvette "agreed to terminate the contract" and "return to Plaintiff his $42,500 and $2,250." (*Id.* ¶¶ 37–38.) Plaintiff then "began to pursue the purchase of a similar or identical [LRD] from other sources." (*Id.* ¶ 39.)

Around September 7, 2018, Plaintiff agreed to purchase a replacement Land Rover Defender (the "Replacement LRD") for approximately $170,000 (*id.* ¶ 41), which was the "cheapest price [he] could find for a materially similar LRD, after making diligent efforts to locate [the] same, due to the rarity of that specific model." (Way Cert. ¶ 4, ECF No. 5-2.). Additionally, Plaintiff paid an additional $9,061.65 for "accessories needed to make the Replacement LRD materially identical to the LRD." (*Id.* ¶ 5.) Plaintiff financed the "entire $170,000 purchase price of the Replacement LRD." (*Id.* ¶ 6.) After Plaintiff purchased the Replacement LRD, Defendants continued to tell Plaintiff that they would return Plaintiff's money. (Compl. ¶ 44.)

C.     *Plaintiff's Colorado Lawsuit*

Plaintiff retained counsel in Colorado to assist him with recouping his money. (*See id.* ¶ 45.) On October 26, 2018, Allvette returned the $2,250. (*Id.* ¶ 46.)

Around November 19, 2018, Plaintiff "sent a letter to Allvette and Defendants demanding the return of Plaintiff's $42,500 by close of business on November 26, 2018" and threatening legal action if the money was not returned. (*Id.* ¶ 49.) Allvette informed Plaintiff that it had already returned the $2,250 and that Defendants held the remaining $42,500. (*Id.* ¶ 50.) That day, Defendants proposed to complete and deliver the LRD if Plaintiff paid Defendants another $42,500 before delivery. (*Id.* ¶ 51.) Plaintiff rejected this proposal, reiterated the

"demand for the immediate return of his $42,500 from Defendants, and threatened legal action if Defendants failed to do so." (*Id.* ¶ 52.) Defendants never responded. (*Id.* ¶ 53.)

Around May 15, 2019, Plaintiff learned that Defendants had sold the LRD to a dealership in Massachusetts back in July 2018, which was four months before Defendants and Plaintiff agreed to terminate Plaintiff's purchase of the LRD. (*Id.* ¶ 54.) The dealership was "unaware of Defendants' prior agreement to sell the LRD to Plaintiff." (*Id.* ¶ 56.)

Around May 29, 2019, Plaintiff sent another letter to Defendants requesting the return of Plaintiff's $42,500 by close of business on June 5, 2019. (*Id.* ¶ 57.) Defendants failed to return the money. (*Id.* ¶ 58.) Plaintiff filed a complaint against Arete in Colorado State Court, Docket No, 2019CV32281 (the "Colorado Action"). (*Id.* ¶ 60.) Arete defaulted. (*Id.* ¶ 61.)

Around September 26, 2019, default judgment was entered against Arete in the Colorado Action in the amount of $137,491.32, which represented the $42,500, trebled under the relevant Colorado law, plus interest, costs, and attorney's fees. (*Id.* ¶ 61.) Fargesen informed Plaintiff's counsel that "Arete had no assets" and that "Fargesen—as Arete—would simply cause Arete to file for bankruptcy" if Plaintiff attempted to enforce the default judgment. (*Id.* ¶¶ 62–63.) According to state filings, Fargesen is Arete's "sole principal and registered agent," "Arete had ceased filing its annual reports with the State for two prior years," and Arete's corporate status had been revoked since approximately November 2018. (*Id.* ¶ 64.)

On January 16, 2020, the Colorado court amended the judgment in the Colorado Action to name both Defendants as judgment-debtors, jointly and severally, for $137,491.32. (*Id.* ¶ 66.) Plaintiff docketed this judgment in New Jersey. (*Id.* ¶ 67.)

Defendants moved to vacate the amended judgement and dismiss the Colorado action for lack of personal jurisdiction, which the Colorado court granted on August 10, 2020. (*Id.* ¶ 69.)

## II.      Procedural Background

On September 30, 2020, Plaintiff filed the Complaint before this Court, bringing statutory claims under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A § 56:8-19 and the Colorado Civil Theft Act ("CCTA"), C.R.S. § 18-4-405; and common law claims of conversion, fraud, unjust enrichment, breach of contract, and promissory estoppel. (*Id.* ¶¶ 73–114.)

On November 16, 2020, Plaintiff served Defendants. (Fassett Cert. of Service ¶¶ 2–3, ECF No. 3.) Defendants did not respond. On December 8, 2020, Plaintiff filed a Request to Enter Default, which the Clerk entered. (Req. to Enter Default at 1, ECF No. 4.)[1]

On January 8, 2021, Plaintiff filed a Motion for Default Judgment. (ECF No. 5.) On January 26, 2021, Defendants' counsel filed a Notice of Appearance and a Stipulation to Extend Response to Answer Complaint (ECF Nos. 6–7), which the Court granted, (Stipulation and Order at 2, ECF No. 8.)[2] The Court stated that Defendants waived any defenses related to the sufficiency of process, and ordered Defendants to respond by January 29, 2021. (*Id.* at 1–2.) The Court also vacated the entry of default and withdrew the Motion for Default Judgment. (*Id.*) Plaintiff reserved his right to seek attorney's fees and costs in relation to Defendants' failure to appear and Defendants reserved their right to oppose such an application. (*Id.*)

On January 29, 2021, Defendants filed an Answer. (Answer at 11, ECF No. 9.) The parties began discovery. Plaintiff produced several witnesses and hundreds of documents; Defendants produced one potential witness and no documents. (Suppl. Cert. ¶¶ 6–10, ECF No. 26-1.)

---

[1] The page numbers to which the Court refers are the CM/ECF page numbers.
[2] The page numbers to which the Court refers are the CM/ECF page numbers.

On July 8, 2021, Defendants' counsel filed a Motion to Withdraw as Attorney due to Defendants' failure to pay for their legal services. (Def. Counsel Mot. to Withdraw ¶¶ 3, 9, ECF No. 16-1.) On July 20, 2021, the Court entered a text order requiring Defendants to respond to the Motion to Withdraw by August 6, 2021. (ECF No. 18.) When Defendants failed to respond, the Court granted the Motion and required Defendants to retain new counsel by September 3, 2021. (Order Granting Mot. to Withdraw at 2, ECF No. 21.) The Court further ordered that if Arete "does not retain new counsel by September 3, 2021, and/or . . . Fargesen fails to retain new counsel or indicate an intention to proceed pro se by September 3, 2021[,] . . . Plaintiff may request that default be entered against them" and that the Motion for Default Judgment be reinstated. (*Id.*) Defendants were served with this Order. (Aff. Service ¶ 2, ECF No. 22.)

Defendants did not respond. Plaintiff's Motion for Default Judgment was reinstated. (Order Reinstating Mot. for Default J. at 2, ECF No. 25.) On September 15, 2021, Plaintiff filed a Supplemental Certification in Further Support of Motion for Final Default Judgment. (Suppl. Cert. at 7.) Defendants have not opposed. Plaintiff's reinstated Motion for Default Judgment (ECF No. 5) and the Supplemental Certification (ECF No. 26) are before the Court.

## LEGAL STANDARD

### I.    Default Judgment Standard

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a).

After an entry of default by the Clerk, a district court may enter default judgment under Federal Rule of Civil Procedure 55(b)(2) against a properly served defendant who fails to plead or otherwise defend an action. *See Sourcecorp Inc. v. Croney*, 412 F. App'x 455, 458 (3d Cir.

2011) (citing Fed. R. Civ. P. 55(a)). "Default judgment is permissible only if plaintiff's factual allegations establish a right to the requested relief." *Eastern Constr. & Elec., Inc. v. Universe Techs., Inc.*, 2011 WL 53185, at *3 (D.N.J. Jan. 6, 2011). The court must accept a plaintiff's well-pled factual allegations, except for those relating to the amount of damages. *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

A party who has made a proper showing under Rule 55 is not entitled to default judgment as of right; it is within the district court's discretion. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984) (citing *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 244 (3d Cir. 1951)). Default judgment is a sanction of last resort; cases are more appropriately decided on their merits where practicable. *See Hill v. Williamsport Police Dep't*, 69 F. App'x 49, 51 (3d Cir. 2003); *Hritz*, 732 F.2d at 1181. A court must assess three factors to determine whether default judgment is appropriate: "(1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether the defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000).

## II. Rule 9(b)

The heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to Plaintiff's claims of statutory and common law fraud (Counts I and IV). *See Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other conditions of mind of a person may be averred generally." *Id.* "[A] plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged." *Id.* (internal quotation marks omitted). To meet this standard, the plaintiff must allege "the date, time and

8

place of the alleged fraud or otherwise inject some measure of substantiation into [the] fraud allegation." *Id.*

## <u>DISCUSSION</u>

### I.      Entry of Default

Entry of default is appropriate because Defendants have not participated in the litigation since June 7, 2021. (*See* Suppl. Cert. ¶ 9, ECF No. 26-1.) Thus, they have failed to "plead or otherwise defend." *See* Fed. R. Civ. P. 55(a); *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 918 (3d Cir. 1992) (noting the "approval of entry of a default judgment under Rule 55 against a party who had answered but failed to appear at trial"). Further, the Court notified Defendants that it would reinstate the entry of default if they failed "retain new counsel or indicate an intention to proceed pro se," and Defendants failed to do so. (Order Granting Mot. to Withdraw at 2.)

Plaintiff's Motion for Default Judgment is unopposed. To determine whether default judgment is appropriate, the Court will consider both (1) the sufficiency of Plaintiffs' claims and (2) the *Chamberlain* factors. *See* 210 F.3d at 164.

### II.     Sufficiency of Plaintiff's Claims

In support of its Motion for Default Judgment, Plaintiff addresses each count in the Complaint, the elements for each of those counts, and the facts to support his claims to establish his right to relief. (Mot. for Default J. at 14–20 ECF No. 5-1.)

A.      *New Jersey Consumer Fraud Act (Count I)*

The NJCFA prohibits the use of deceptive, fraudulent, or unconscionable commercial practices in connection with "the sale or advertisement of any merchandise." N.J.S.A. 56:8-2.

"Merchandise" includes objects or goods that are offered "to the public for sale." *Id.*

56:8-1(c). The "public" refers to the "public at large." *Princeton Healthcare Sys. v. Netsmart New York, Inc.*, 422 N.J. Super. 467, 473 (App. Div. 2011). Accordingly, "merchandise" refers to "consumer goods" that are available for "mass distribution," *Kugler v. Romain*, 58 N.J. 522, 536 (1971), or are "generally standardized and [do] not require individualized bargaining," *City of Atl. City v. Zemurray St. Cap., LLC*, 192 F. Supp. 3d 563, 568 (D.N.J. 2016).

The NJCFA does not, however, apply to consumer goods that "deal[] with specific agreements and individualized negotiations." *See id.* at 568–69. *Compare Princeton Healthcare Sys.*, 422 N.J. Super. at 473 (finding that a "custom-made [software] program to satisfy [the customer's] unique needs" did not "constitute a 'sale of merchandise' within the intent of the [NJ]CFA"), *with Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 509 (D.N.J. 1999) (finding that a crane is merchandise under the NJFCA because it is "generally available to the public" and "in use at construction sites across the globe").

Here, the LRD is not a consumer good that is "generally standardized" or available for "mass distribution." *See City of Atl. City*, 192 F. Supp. 3d at 568; *Kugler*, 58 N.J. at 536. Rather, Plaintiff and Defendants had "individualized" negotiations to create a custom car to suit Plaintiff's "unique" design specifications. *See City of Atl. City*, 192 F. Supp. 3d at 568; *Princeton Healthcare Sys.*, 422 N.J. Super. at 473. Thus, Plaintiff's NJCFA claim fails because the LRD is not "merchandise" under the NJCFA.

B.    *Colorado Civil Theft Act (Count II)*

Under the CCTA, "[a]ll property obtained by theft, robbery, or burglary shall be restored to the owner and no sale . . . shall divest the owner of his right to such property." Colo. Rev. Stat. Ann. § 18-4-405. "For the stolen property statute to apply, 'the owner of the property must prove that the taker . . . committed acts constituting at least one of the statutory crimes' listed within

the statute." *West v. Roberts*, 143 P.3d 1037, 1040 (Colo. 2006) (quoting *Itin v. Ungar*, 17 P.3d 129, 134 (Colo. 2000)). To state a claim under the CCTA for theft, therefore, the plaintiff must plead two culpable mental states: "(1) that the defendant knowingly obtained control over the owner's property without authorization and (2) that he or she did so with the specific intent to permanently deprive the owner of the benefit of property." *Itin*, 17 P.3d at 134 (quoting Colo. Rev. Stat. Ann. § 18-4-401(1)).

Plaintiff's CCTA fails because the Complaint does not plausibly state that, when Defendants obtained control over Plaintiff's money, they had the specific intent to permanently deprive Plaintiff of his $42,500 by never delivering the LRD. (*See generally* Compl. ¶¶ 17–27); *see also Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 608 (finding that the plaintiff failed to state a claim of civil theft because the complaint "fail[ed] to adequately allege the knowing deprivation of a thing of value" and thus, "fail[ed] to allege the requisite mental state").

C.       *Fraud (Count IV)*

To state a claim for fraud, the plaintiff must allege that the defendant (1) made a material misrepresentation of a presently existing or past fact, (2) knew or believed the misrepresentation was false, and (3) knowingly made the representation with the intent to induce the plaintiff's reliance; and that the plaintiff (4) reasonably relied on the misrepresentation; and (5) suffered damages as a result. *Allstate New Jersey Ins. Co. v. Lajara*, 222 N.J. 129, 147 (2015).

Plaintiff alleges the following representations as bases for his fraud claim: (1) the "numerous occasions" in which Defendants represented that they would deliver the LRD to Plaintiff, even after "they had previously sold [it] to another party;" (2) Defendants' agreement to return Plaintiff's $42,500, which they never did; and (3) Defendants "propos[al] to complete the work on the LRD if Plaintiff would pay an additional $42,500" despite the fact that they had

11

sold the LRD to another party. (Mot. for Default J. at 17.)

Plaintiff fails to plead his fraud claim with the specificity required by Rule 9. Regarding the first alleged misrepresentation, Plaintiff alleges that DeCerchio, a representative of Allvette, "repeatedly" gave Plaintiff "excuses for the delays and promises of new future dates of completion and delivery." (Compl. ¶ 30.) Regarding the second alleged misrepresentation, Plaintiff alleges that Defendants "agreed to terminate the contract for the custom LRD and to return Plaintiff his $42,500[.]" (*Id.* ¶ 38.) Both allegations fail to meet the heightened pleading standard for fraud because they do not state "the date, time, and place of the alleged fraud" or "inject some substantiation" to explain the particular circumstances surrounding the alleged misrepresentations, *e.g.*, what Defendants actually said. *Frederico*, 507 F.3d at 200. Thus, the Court finds that the Complaint fails to Defendants on notice of the "precise misconduct" that Plaintiff alleges is fraudulent. *See id.*

Regarding the third alleged misrepresentation, Plaintiff alleges that "Defendants had in fact sold the LRD to a dealership in Massachusetts in or around July 2018," which was "approximately four months before Defendants and Plaintiff agreed to terminate Plaintiff's purchase of the LRD." (Compl. ¶ 54.) The Complaint further states that, based on the date of Defendants' sale of the LRD to another dealership, "Defendants' subsequent proposal to complete the custom LRD upon Plaintiff's delivery of an additional $42,500 was fraudulent." (*Id.* ¶¶ 55.) While this sufficiently states the "precise misconduct" that Plaintiff alleges is fraudulent, this claim fails because Plaintiff rejected this proposal. (*Id.* ¶ 52.) Thus, Plaintiff did not rely on or suffer damages as a result of these representations. *See Allstate New Jersey Ins. Co.*, 222 N.J. at 147. Accordingly, Plaintiff has not stated a common law fraud claim.

D.     *Breach of Contract (Count VI)*

"To state a claim for breach of contract, [a plaintiff] must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations. *Frederico*, 507 F.3d at 203.

"A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992) (quoting *Borough of W. Caldwell v. Borough of Caldwell*, 26 N.J. 9, 24 (1958)). To create an enforceable contract, the "parties [must] agree on essential terms and manifest an intention to be bound by those terms." *Id.* "An offeree may manifest assent to the terms of an offer through words, creating an express contract, or by conduct, creating a contract implied-in-fact." *Id.* at 436. To create a contract by conduct, therefore, New Jersey courts have determined that, where a party gives no indication that he "objects to the offer's essential terms" and he "accepts the benefit of the offeror's performance," he has "impliedly manifested [his] unconditional assent to the terms of the offer." *Id.* at 436–37 (finding that the "offeree's silence and actions, which induced offeror's detrimental reliance" was acceptance) (citing *Iacono v. Toll Bros.*, 225 N.J. Super. 87, 91–92 (App. Div. 1988)).

Here, Plaintiff has plausibly alleged that Defendants' conduct created a contract between Plaintiff and Defendants: Plaintiff and Defendants "work[ed] through the custom design specifications together (Compl. ¶ 23); Defendants "assured" him that the LRD would be "completed and delivered" within ten to fourteen weeks (*id.* ¶ 21); and Defendant accepted Plaintiff's $42,500 (*see id.* ¶ 26). Defendants' assurances that they would complete and deliver the LRD to Plaintiff's design specifications show that they did not object to Plaintiff's desired terms of performance. (*See id.* ¶ 21); *Weichert*, 128 N.J. at 436–37. And, the fact that Defendants

13

accepted the $42,500 shows that they "accepted the benefit" of Plaintiff's performance. (*See* Compl. ¶ 26); *Weichert*, 128 N.J. at 436–37. Thus, despite Plaintiff reaching a "written agreement with SD to purchase the LRD," the Court finds Defendants' conduct sufficient to establish that a contract existed between Plaintiff and Defendants. (*See* Compl. ¶ 23.)

Plaintiff has plausibly alleged the remaining elements of a breach of contract claim. He alleges that Defendants breached the contract by failing to complete and deliver the custom LRD. (*See* Compl. ¶ 35.) Plaintiff has also plausibly alleged that "damages flow[ed]" from the breach because Plaintiff paid $42,500 for the LRD and the cost of the Replacement LRD. *See Frederico*, 507 F.3d at 203; (Compl. ¶¶ 40–41, 47.) Last, Plaintiff "performed [his] own contractual obligations" by paying the 50% of the purchase price upfront. *See Frederico*, 507 F.3d at 203; (Compl. ¶ 24–25). Thus, Plaintiff sufficiently stated a claim for breach of contract.

E.     *Conversion (Count III)*

"Conversion is an intentional exercise of domain or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Wilmington Sav. Fund Soc'y, FSB as Tr. of Stanwich Mortg. Loan Tr. A v. Otieno-Ngoje*, 2020 WL 747066, at *3 (D.N.J. Feb. 14, 2020), aff'd sub nom., 2021 WL 4429832 (3d Cir. Sept. 27, 2021). While traditionally applied to chattels, "conversion applies to money, provided that the money ha[s] belonged to the injured party and that it be identifiable." *Meisels v. Fox Rothschild LLP*, 240 N.J. 286, 304 (2020) (internal quotation marks omitted). "[W]here possession begins lawfully and . . . the owner demands return of the property and the possessor refuses, then a conversion has occurred." *Id.* at 305.

Here, Defendants hold Plaintiff's $42,500 and "refuse to return [it]" despite Plaintiff requesting its return. (Compl. ¶ 71.) Thus, Plaintiff stated a claim for conversion.

14

F.      *Unjust Enrichment (Count V)*

"To establish a claim for unjust enrichment under New Jersey law, a plaintiff must allege 'both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" *Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 505 (D.N.J. 2006) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994)). Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law. *Id.* (citing to *National Amusements, Inc. v. N.J. Tpk. Auth.*, 261 N.J. Super. 468, 478 (Law Div.1992), aff'd, 275 N.J. Super. 134, 645 A.2d 1194 (App.Div.1994)).

Here, because the Court found that Plaintiff plausibly pled breach of contract, there is an "adequate remedy at law." *See Adamson*, 463 F. Supp. 2d at 505. Thus, the Court need not decide Plaintiff's unjust enrichment claim.

G.      *Promissory Estoppel (Count VII)*

"Promissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Goldfarb v. Solimine*, 245 N.J. 326, 339–40 (2021) (quoting *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*, 194 N.J. 223, 253 (2008)) (internal quotation marks omitted). "Under New Jersey law, liability based on quasi-contractual principles cannot be imposed 'if an express contract exists concerning the identical matter.'" *Freightmaster USA, LLC v. Fedex, Inc.*, 2015 WL 1472665, at *6 (D.N.J. Mar. 31, 2015) (quoting *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226–27 (3d Cir. 1983) (dismissing promissory estoppel claim because express contract existed)).

Plaintiff argues that promissory estoppel applies to Defendants' agreement to "return Plaintiff's funds" and "terminate Plaintiff's agreement to purchase the LRD." (Mot. for Default

J. at 20). Because the Court found that a contract exists concerning this matter, the Court need not decide Plaintiff's promissory estoppel claim.

## III.    Default Judgment Factors

Because Plaintiff sufficiently pled conversion and breach of contract claims, the Court next examines the equitable factors of default judgment. *See Chamberlain*, 210 F.3d at 164.

First, the Court considers prejudice to Plaintiff if the default is denied. *Id*. Prejudice refers to an impairment of a plaintiff's ability to pursue its claim and recover its sought-after remedy. *See Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 657 (3d Cir. 1982). Failure to file any responsive pleadings may leave a plaintiff without recourse on its claims. *See United Communities, LLC v. Hallowell Int'l, LLC*, 2012 WL 5880295, at *4 (D.N.J. Nov. 21, 2012). Here, Defendants' failure to meaningfully participate in discovery or file any responsive pleadings since the Answer leaves Plaintiff unable to seek recourse on his claims. (Suppl. Cert. ¶¶ 7, 10.) Thus, without default judgment, Plaintiff would be prejudiced because he would be unable to recover under his claims.

Second, the Court considers whether the defendant appears to have a litigable defense. *Chamberlain*, 210 F.3d at 164. The Court already considered this when assessing the sufficiency of Plaintiff's claims.

Finally, the Court considers whether the defendant's delay is due to culpable conduct. *Id*. Culpable conduct refers to "actions taken willfully or in bad faith," *Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 124 (3d Cir. 1983), and that rise above the level of mere negligence, *Sourcecorp, Inc. v. Croney*, 412 F. App'x at 460. Failure to defend, despite service of pleading documents, demonstrates defendant's culpable conduct. *See Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 537 (D.N.J. 2008).

16

Here, Defendants failed to communicate with their defense counsel (*see* Def. Counsel Mot. to Withdraw ¶¶ 3, 9) and to "retain new counsel" or indicate an intention to proceed pro se when ordered to do so (Order on Mot. to Withdraw as Counsel at 2). Defendants' failure to defend, despite being served, goes beyond "mere negligence," and suggests willful avoidance of participating in this litigation. *See Sourcecorp, Inc.*, 412 F. App'x at 460. Thus, this factor weighs in favor of granting default judgment. In sum, the Court finds that the *Chamberlain* factors favor granting default judgment.

## IV.   **Plaintiff's Remedies and Damages Sought**

Plaintiff seeks actual damages, prejudgment interest, attorney's fees, and costs. (Mot. for Default J. at 21–23.)[3] While the Court need not accept the allegations regarding damages as true, *Chanel*, 558 F. Supp. 2d at 535–36, final judgment may be entered where damages are for a sum certain, Fed. R. Civ. P. 55(b)(2). To determine damages, the Court may rely upon detailed affidavits without resorting to a hearing. *Interpool, Inc. v. Four Horsemen, Inc.*, 2017 WL 1284766, at *4 (D.N.J. Mar. 24, 2017).

### A.   *Actual Damages*

Plaintiff seeks $133,861.50 in total monetary damages, which represents:

(1) $42,500, the amount that Plaintiff paid for the LRD, still held by Defendants;
(2) $77,541.25, the difference in cost between the Replacement LRD ($170,000) and the LRD ($92,458.75);
(3) $9,061.65, the amount that Plaintiff paid for accessories on the Replacement LRD;
(4) $4,758.60, the amount of "finance charges" that Plaintiff paid on the borrowed $42,500 to purchase the Replacement LRD.

(Way Cert. ¶¶ 3–8, Ex. A, Ex. B, ECF No. 5-2.)

---

[3] Because the Court found that Plaintiff insufficiently pled NJCFA and CCTA claims, the Court will not consider Plaintiff's request for treble damages.

All of these damages are recoverable as compensatory damages under Plaintiff's breach of contract theory. In breach of contract claims, courts "most often" award compensatory damages, which "put the innocent party into the position he or she would have achieved had the contract been completed." *Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.*, 191 N.J. 1, 12–13 (2007).

In contracts for the sale of goods, if the seller "fails to make delivery," the buyer may cancel the contract, recover the price that has been paid, and seek "cover." N.J.S.A 12A:2-711. The buyer "may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." *See Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 477 (1988) (quoting N.J.S.A. 12:A:2-712)). A plaintiff may recover as damages the "difference between the cost of cover and the contract price together with any incidental or consequential damages." *Id.* "Incidental damages resulting from the seller's breach include . . . expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." N.J.S.A. § 12A:2-715.

The "buyer should not be denied cover damages 'unless the seller comes forward with persuasive evidence that the buyer will reap added profits because of the superior quality of the cover merchandise.'" *Meshinsky*, 110 N.J. at 477 (quoting J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 6–3 at 222 (1980)).

Here, Plaintiff purchased the Replacement LRD in September 2018, approximately five months after the agreed-upon delivery date for the LRD and after he cancelled the purchase of his LRD. (*See* Compl. ¶¶ 36, 41.) First, he is entitled to recover "the price that has been paid" under the breached contract, *i.e.*, the $42,500 that Defendants still hold. *See* N.J.S.A 12A:2-711.

Second, he is entitled to recover the $77,541.25, which is the price difference between the

18

Replacement LRD ($170,000) and the LRD ($92,458.75), and the $9,061.65 in accessories. According to Plaintiff's affidavit, he made "diligent efforts" to locate a replacement and $170,000 was "the cheapest price [he] could find for a materially similar LRD." (Way Cert. ¶ 4.) He further states that the accessories were necessary "to make the Replacement LRD materially identical to the LRD." (*Id.* ¶ 5.) Further, these amounts are for a "sum certain," Fed. R. Civ. P. 55(b)(2), demonstrated by the receipts of both purchases attached to Plaintiff's affidavit, (*see* Way Cert. ¶¶ 3–8; Ex. A, Ex. B). Thus, absent evidence otherwise, the Court finds that Plaintiff's purchase of the Replacement LRD and accessories occurred in good faith and without unreasonable delay. *See Meshinsky*, 110 N.J. at 477 (finding a replacement boat, purchased four months after rescission, which had "approximately 90% of the contract boat's features and cost $26,000 more than the replacement boat," was a reasonable cover purchase).

Third, Plaintiff's "finance charges" are recoverable as incidental damages. According to his affidavit, Plaintiff incurred these finance charges because, when he sought cover and purchased the Replacement LRD, he had to borrow the $42,500 that Defendant failed to return. (*See* Way Cert ¶¶ 5, 7.) Thus, the $4,758.60 in finance charges on the borrowed money are "expenses . . . in connection with effecting cover." *See* N.J.S.A. § 12A:2-715.

In sum, this award of damages places Plaintiff, the "innocent party[,] into the position he [] would have achieved had the contract been completed" because it allows Plaintiff to have the Replacement LRD at the price he initially bargained for when purchasing the LRD. *See Totaro*, 191 N.J. at 12–13. Thus, Plaintiff may recover $133,861.50 in actual damages.

B.    *Prejudgment Interest*

In a diversity action, such as here, state law applies in determining prejudgment interest. *Jarvis v. Johnson*, 668 F.2d 740, 746 (3d Cir. 1982). A district court exercises its discretion to

award prejudgment interest on "considerations of fairness." *Thabault v. Chait*, 541 F.3d 512, 533 (3d Cir. 2008) (internal quotation marks omitted). "[T]he purpose of prejudgment interest is to 'compensate the plaintiff for the loss of income that would have been earned on the judgment had it been paid earlier.'" *Id.* (quoting *Ruff v. Weintraub*, 105 N.J. 233, 244–45 (1987)).

Plaintiff seeks prejudgment interest on the $42,500 payment from the date it was paid in early February 2018 through September 20, 2021. (Suppl. Cert. ¶ 20.) This amounts to $2,372.92. (*Id.*) Because Defendants delayed final judgment by failing to timely respond despite being served, the Court finds it fair to award Plaintiff prejudgment interest as requested.

C.    *Attorney's Fees and Costs*

Plaintiff submitted itemized attorney's fees for both the Colorado Action and the action before this Court.

Plaintiff seeks $10,138.50 in attorney's fees from the Colorado attorney that represented him in the Colorado Action. (Murray Cert. ¶ 4, Ex. A, Ex. B, ECF No. 5-3; Suppl. Cert. ¶¶ 25–27, Ex. B, ECF No. 26-1.) Additionally, Plaintiff seeks $47,508.10 for services completed by New Jersey counsel. (Fassett Cert. ¶¶ 2–4, Ex. A, ECF No. 5-4; Suppl. Cert. ¶ 24, Ex. A). This totals $57,646.60 in requested attorney's fees. (Suppl. Cert. ¶ 29.) Plaintiff also seeks to recover costs incurred totaling $968.43. (*Id.*; Fassett Cert. ¶ 4.)

"New Jersey follows the 'American Rule,' which requires litigants to bear their own litigation costs, regardless of who prevails. *Kamienski v. State, Dep't of Treasury*, 451 N.J. Super. 499, 521 (App. Div. 2017) (citing to *Innes v. Marzano–Lesnevich*, 224 N.J. 584, 592 (2016)). However, the prevailing party may recover attorney's fees if "'they are expressly provided for by statute, court rule, or contract.'" *Id.* (quoting *Packard–Bamberger & Co. v. Collier*, 167 N.J. 427, 440 (2001)).

20

Here, there are no applicable statutes or court rules that entitle Plaintiff to recover attorney's fees for his claims, nor does Plaintiff allege that the contract provides for attorney's fees for the non-breaching party. However, when seeking default judgment, a party is entitled to attorney's fees incurred in obtaining the default. *John Reiner & Co. v. Dorsey Roofing Co.*, 187 N.J. Super. 51, 55 (Law. Div. 1982); *see also* N.J. Ct. R. 1:2-4. Thus, the Court will award reasonable attorney's fees and costs incurred in obtaining the default judgment.

Based on its review of the submitted documents, the Court finds that reasonable attorney's fees in recovering the default judgment are $1,269.00 for Colorado counsel and $15,259.08 for New Jersey counsel. For Colorado counsel, the $1,269.00 includes services involved in setting aside the default judgment in the Colorado Action and pursuing the Defendants in New Jersey federal court. (*See* Murray Cert. ¶ 4, Ex. B.)

For New Jersey counsel, the $15,259.08 covers services in filing the Motion for Default Judgment (ECF No. 5) and the Supplemental Certification (ECF No. 26). This includes attorney's fees incurred for services from December 8, 2020 through January 8, 2021, totaling $7,346.58, (*see* Fassett Cert. ¶¶ 2–4, Ex. A), and for services from July 8, 2021 through September 15, 2021, totaling $7,912.50 (*see* Suppl. Cert. ¶ 24, Ex. A).

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Default Judgment is granted in part and denied in part. An appropriate Order will follow.

Date: <u>January 20, 2022</u>                                  <u>/s/ Anne E. Thompson</u>
                                                        ANNE E. THOMPSON, U.S.D.J.